UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
DR. JACK SILVER,                                      :
                                                      :
                         Plaintiff,                   :      Civil Action No.: 05 CV 6844 (DC)(GWG)
                                                      :
              -against-                               :
                                                      :      **DEFENDANTS' LOCAL CIVIL**
NORTH SHORE UNIVERSITY                                :      **RULE 56.1 STATEMENT**
HOSPITAL, NORTH SHORE-LONG                            :
ISLAND JEWISH HEALTH SYSTEM,                          :
INC. and THE FEINSTEIN INSTITUTE                      :
FOR MEDICAL RESEARCH (F/K/A THE                       :
INSTITUTE FOR MEDICAL RESEARCH),                      :
                                                      :
                         Defendants.                  :
-----------------------------------------------------------x

Pursuant to Local Civil Rule 56.1, Defendants, North Shore University Hospital, North

Shore-Long Island Jewish Health System, Inc. and The Feinstein Institute for Medical Research

(f/k/a The Institute for Medical Research), submit the following statement of undisputed facts in

support of their motion for summary judgment:

A.   **Dates Of Birth**

1.      Dr. Nicholas Chiorazzi ("Chiorazzi") was born on October 2, 1945.  (Chiorazzi

Dep. p.9).

2.      Dr. Lawrence Scherr ("Scherr") was born on November 6, 1928. (Scherr Aff ¶2).

3.      Dr. Jack Silver ("Plaintiff") was born on January 1, 1946. (Plaintiff Dep. p.99).

4.      Robin Wittenstein ("Wittenstein") was born on August 18, 1959. (Wittenstein

Aff. ¶2).

5.      Dr. Bettie Steinberg ("Steinberg") was born on June 13, 1937. (Chiorazzi Aff.

¶20).

**B.**      **Plaintiff's Employment At The Hospital**

6.       In early-1988, Chiorazzi requested that the Department of Medicine hire a molecular biologist to complement his division. (Chiorazzi Aff. ¶4).

7.       Scherr approved the request and charged Chiorazzi with the responsibility of finding an appropriate candidate, checking references and reporting on the candidate's qualifications. (Scherr Aff. ¶4; Chiorazzi Aff. ¶4; Chiorazzi Dep. p.126).

8.       Chiorazzi specifically solicited Plaintiff for the position. (Chiorazzi Aff. ¶5).

9.       Throughout 1988, Scherr and Chiorazzi had a series of conversations and meetings with Plaintiff regarding his candidacy. (Scherr Aff. ¶5; Chiorazzi Aff.¶6).

10.      Chiorazzi recommended Plaintiff to Scherr for hire. (Chiorazzi Aff. ¶6; Scherr Aff. ¶7).

11.      Based on Chiorazzi's recommendation, Scherr hired Plaintiff on January 1, 1989. (Scherr Aff. ¶7).

12.      Plaintiff and Chiorazzi were both 43 years old at the time Plaintiff was hired. (Chiorazzi Dep. p.9; Plaintiff Dep. p.99).

13.      Plaintiff was primarily responsible for: (1) conducting disease-oriented research; and (2) obtaining external funding by applying for grants and soliciting donations in order to support the costs associated with his research. (Scherr Aff. ¶8; Plaintiff Dep. p.15).

14.      On June 30, 1999, the National Institute of Health ceased funding Plaintiff's research. (Exhibit K).

**C.**      **The Research Institute**

15.      In 2000, approximately 65 researchers, including Plaintiff, were appointed to The Feinstein Institute for Medical Research ("Research Institute") to continue their research.

2

(Chiorazzi Aff. ¶10).

16.     Associate Investigators and Investigators on the Scientific Track at the Research Institute generally head their own research laboratory ("Laboratory Heads") and are responsible for obtaining external funding, i.e., grants, donations, to cover the costs associated with their research laboratories, i.e., overhead, salaries, fringe benefits, supplies. (Chiorazzi Aff. ¶13; Chiorazzi Dep. p.31, 33).

17.     Chiorazzi was appointed Director and Chief Executive Officer of the Research Institute when it was created. (Chiorazzi Dep. p.11; Chiorazzi Aff. ¶11).

18.     In these positions, he was responsible for overseeing the investigators and the research they were conducting. (Chiorazzi Dep. p.26-28; Chiorazzi Aff. ¶11).

**D.     Plaintiff's Employment At The Research Institute**

19.     At the Research Institute, Plaintiff was an Investigator on the Scientific Track and was a Laboratory Head. (Plaintiff Dep. p.20; Chiorazzi Aff. ¶14).

20.     His primary responsibilities were to conduct research, obtain external funding and to be productive scientifically. (Plaintiff Dep. p.23, 25-26, 83; Chiorazzi Aff. ¶13).

21.     In 2000, it cost approximately $423,000 to operate Plaintiff's laboratory and he only obtained approximately $68,000 in external funding. (Halfant Aff. ¶5).

22.     In 2001, it cost approximately $361,000 to operate Plaintiff's laboratory and he only obtained approximately $207,000 in external funding. (Halfant Aff. ¶6).

23.     In 2002, it cost approximately $239,000 to operate Plaintiff's laboratory and he only obtained approximately $151,000 in external funding. (Halfant Aff. ¶7).

24.     On March 21, 2003, Chiorazzi evaluated Plaintiff's performance. (Exhibit L).

25.     On the evaluation, Chiorazzi wrote the following comments about Plaintiff with

respect to his funding:

> The main concern is that funding is inadequate to support
> continuation of current program. He is advised to focus on writing
> & submitting grant applications to federal and non-federal sources.
> (Exhibit L).

26.     Plaintiff agreed with Chiorazzi's comments and admitted that he was also
concerned about his level of funding. (Plaintiff Dep. p.31-33).

27.     In 2003, it cost approximately $328,000 to operate Plaintiff's laboratory and he
only obtained approximately $83,000 in external funding. (Halfant Aff. ¶8).

28.     In 2003, Plaintiff only submitted three applications for grants. (Exhibit M).

29.     On September 1, 2003, Dr. Hao Peng Duffy ("Duffy"), who was born on
December 6, 1949 and was a Laboratory Head at the Research Institute, was terminated by
Chiorazzi at the age of 53 because of her inability to obtain external funding for her laboratory.
(Chiorazzi Aff. ¶28; Halfant Dep. p.46).

30.     At the time of her termination, Duffy was four years younger than Plaintiff.
(Chiorazzi Aff. ¶28).

31.     In spring and summer 2004, Chiorazzi had several conversations with Plaintiff
about his lack of sufficient external funding and explained to him that the Research Institute
would not continue to fund his laboratory. (Plaintiff Dep. p.73; Chiorazzi Aff. ¶16).

32.     Chiorazzi consistently encouraged Plaintiff to seek external funding. (Plaintiff
Dep. p.76).

33.     In mid-August 2004, the New York Crohn's Foundation discontinued funding
Plaintiff's laboratory because of his unwillingness to work with other researchers and for
spending the funds on an unapproved project. (Exhibit N).

34.     As a result, Plaintiff lost, as of July 1, 2004 and on a going forward basis,

4

$150,000 in annual funding. (Plaintiff Dep. p.41; Exhibit O).

35. His only source of external funding left was an active grant from the North Shore-Long Island Jewish Health System, Inc. ("Health System") in the amount of $36,000 that was set to expire on March 31, 2005. (Exhibit O).

36. Despite losing his largest source of external funding, Plaintiff did not submit any new applications for funding for the remainder of 2004. (Exhibit M).

37. Rather, he resubmitted the same application for external funding that had been rejected twice before ("NIH application"). (Exhibit M).

38. After the New York Crohn's Foundation discontinued funding, Chiorazzi Wittenstein met with Plaintiff to discuss his lost funding and his current funding situation. (Chiorazzi Aff. ¶17; Wittenstein Aff. ¶6).

39. At the meeting, Plaintiff was told that he needed to obtain sufficient external funding in order to continue his research. (Wittenstein Aff. ¶6).

40. Sometime after the meeting, on November 7, 2004, Plaintiff terminated a 75 year old technician in his laboratory because he, admittedly, was running out of funding and did not have enough funds to pay her salary. (Plaintiff Dep. p.87-88; Chiorazzi Aff. ¶18).

41. On November 23, 2004, Chiorazzi evaluated Plaintiff's performance. (Exhibit P).

42. On the evaluation, Chiorazzi wrote the following comments about Plaintiff with respect to his funding:

> Needs to continue to pursue peer-reviewed research support from the NIH and other foundations & agencies. Cannot rely solely on contribution funds to support research program.(Exhibit P).

43. Plaintiff agreed with Chiorazzi's comment about needing to pursue funding. (Plaintiff Dep. p.72).

5

44.    In late-November 2004, Chiorazzi met with Plaintiff to discuss his November 2004 performance evaluation and the future of Plaintiff's research program. (Plaintiff Dep. p.67; Chiorazzi Aff. ¶19).

45.    At the meeting, Plaintiff suggested that his discovery of a new gene would lead to future funding. (Exhibit R; Exhibit S).

46.    In response, Chiorazzi stated that, in his opinion, external sources were unlikely to fund older established investigators based on "promise" alone. (Chiorazzi Aff. ¶21; Exhibit R; Exhibit S).

47.    After discussing Plaintiff's funding problems, Chiorazzi, who previously consulted with Wittenstein and Steinberg, told Plaintiff that unless he obtained sufficient funding for his laboratory, or could perform research for another Laboratory Head until he obtained funding, he would be terminated by mid-February 2005. (Chiorazzi Dep. p.30, 104-105; Chiorazzi Aff. ¶¶20-21; Wittenstein Aff. ¶7; Exhibit R; Exhibit S).

48.    At the time Plaintiff was informed of the decision to terminate, Chiorazzi was 59 years old and Plaintiff was 58 years old. (Chiorazzi Dep. p.9; Plaintiff Dep. p.99).

49.    Furthermore, Wittenstein was 45 years old and Steinberg was 67 years old at the time. (Wittenstein Aff. ¶2; Chiorazzi Aff. ¶20).

50.    In an effort to assist Plaintiff find a position with another Laboratory Head, Chiorazzi spoke to several Laboratory Heads on Plaintiff's behalf; Plaintiff followed-up by speaking only to two Laboratory Heads: Dr. Kevin Tracey and Dr. Hal Skopicki. (Plaintiff Dep. p.170-171; Chiorazzi Aff. ¶22).

51.    Notably, Plaintiff did not speak to his wife, who was a Laboratory Head, about working in her lab. (Plaintiff Dep. p.171).

52.     Plaintiff did not find a position with a Laboratory Head. (Chiorazzi Aff. ¶23).

53.     In 2004, it cost approximately $337,000 to operate Plaintiff's laboratory and he only obtained approximately $74,000 in external funding. (Halfant Aff. ¶9).

**E.     Plaintiff's Charge Of Discrimination**

54.     In mid-February 2005, Plaintiff filed a Charge of Discrimination with the EEOC alleging that the decision to terminate him because of his inability to obtain sufficient external funding constituted age discrimination. (Exhibit T).

**F.     Plaintiff's Termination**

55.     On or about February 28, 2005, Plaintiff met with Chiorazzi and Wittenstein. (Plaintiff Dep. p.144).

56.     At that meeting, Chiorazzi informed Plaintiff that his last day of work would be March 2, 2005. (Plaintiff Dep. p.144).

57.     Plaintiff had exhausted all of his external funds; leaving himself with $0 when he was terminated. (Halfant Aff. ¶10).

58.     After Plaintiff was terminated, he was not replaced. (Chiorazzi Aff. ¶27).

59.     When he was terminated, Plaintiff had two applications for grants pending: one of which was the NIH application which was rejected twice before, and one was for only $30,000. (Plaintiff Dep. p.123-124; Exhibit M; Exhibit O; Exhibit R; Exhibit S).

60.     The NIH application scored in the 29th percentile that last time it was rejected; generally only applications that score in the 15th percentile receive funding. (Plaintiff Dep. p.124-125).

61.     Even if both applications were funded, Plaintiff's laboratory would have still operated  at a deficit. (Chiorazzi Dep. p.87).

62.     Subsequent to Plaintiff's termination, both applications were rejected. (Plaintiff Dep. p.89-90).

**G.     Composition Of The Research Institute On March 2, 2005**

63.     On March 2, 2005, the date Plaintiff was terminated, the Research Institute employed 35 Laboratory Heads: (a) 6 were between the ages of 40 to 44; (b) 8 were between the ages of 45 to 49; (c) 10 were between the ages of 50 to 54; and (d) 5 were between the ages of 55 to 59. (Chiorazzi Aff. ¶26; Plaintiff Dep. p.80).

64.     In addition, 6 Laboratory Heads were older than Plaintiff, including his wife. (Chiorazzi Aff. ¶26).

65.     The youngest Laboratory Head was 40 years old and the oldest Laboratory Head was 67 years old. (Chiorazzi Aff. ¶26).

**H.     Termination of Dr. David Callaway**

66.     Approximately two months after Plaintiff was terminated, on May 16, 2005, Dr. David Callaway ("Callaway"), who was born on September 11, 1956 and was a Laboratory Head, was terminated by Chiorazzi at the age of 48 because of his inability to obtain sufficient external funding for his laboratory. (Chiorazzi Dep. p.158-159, 162; Halfant Dep. p.46; Chiorazzi Aff. ¶28).

67.     At the time of his termination, Callaway was 11 years younger than Plaintiff and had a grant of $100,000; more external funding than Plaintiff had at the time of his termination. (Chiorazzi Aff. ¶28; Exhibit R; Exhibit S).

Dated: December 1, 2006
New York, New York

Respectfully submitted,

VENABLE LLP
The Chrysler Building
405 Lexington Avenue, 62nd Floor
New York, New York 10174
(212) 307-5500

By:

                                  

Michael J. Volpe (MV-0171)
Shaffin A. Datoo (SD-6929)

ATTORNEYS FOR DEFENDANTS