UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

DR. JACK SILVER,

               Plaintiff,

       - against -

NORTH SHORE UNIVERSITY HOSPITAL,
NORTH SHORE-LONG ISLAND JEWISH
HEALTH SYSTEM, INC., and THE
FEINSTEIN INSTITUTE FOR MEDICAL
RESEARCH,

               Defendants.

- - - - - - - - - - - - - - - - - -x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/21/2007
```

**OPINION**

05 Civ. 6844 (DC)

**APPEARANCES:**       LAW OFFICES OF DANIEL S. BRAVERMAN
                    Attorneys for Plaintiff
                       By: Daniel S. Braverman, Esq.
                    225 Broadway, Suite 1901
                    New York, NY  10017

                    VENABLE LLP
                    Attorneys for Defendants
                       By: Michael J. Volpe, Esq.
                            Shaffin A. Datoo, Esq.
                    The Chrysler Building
                    405 Lexington Avenue, 62nd Floor
                    New York, NY  10174

**CHIN, D.J.**

            In this employment discrimination case, plaintiff Dr.
Jack Silver, a research scientist, alleges that his former
employers, defendants North Shore-Long Island Jewish Health
System (the "Health System"), North Shore University Hospital
(the "Hospital"), and the Feinstein Institute for Medical
Research (the "Institute"), discriminated against him because of
age, in violation of federal and state law.  He also alleges that
defendants retaliated against him by discharging him after

learning that he filed an age discrimination claim with the Equal Employment Opportunity Commission (the "EEOC").

Defendants move for summary judgment, contending that they fired Silver for a legitimate business reason -- he was unable to obtain funding to support his research.  In opposition to the motion, however, Silver has presented direct evidence that defendants discriminated against him because of his age, including deposition testimony from his supervisor that age was a factor in defendants' decision to fire him.  Silver has also submitted a recording of a conversation with his supervisor, wherein the supervisor stated:  "[L]et's face it, we're both almost 60 years old, right? . . . People are not going to lay out money for people like us any more . . . on the basis of promise. . . . [T]hat's the world's decision, I'll be frank with you."  Accordingly, and for the reasons that follow, the motion is denied.

**BACKGROUND**

**A.   Facts**

Construed in the light most favorable to Silver, the nonmoving party, the facts are as follows.

**1.   Silver's Employment**

Sometime prior to 1989, Silver, then approximately forty-three years old, was recruited to join the Health System and Hospital by Dr. Nicholas Chiorazzi (also then approximately forty-three years old) and Hospital chairman Larry Sherr. (Scherr

Aff. ¶¶ 5-6; Silver Dep. 13:16-25).  Silver was employed at the
Hospital starting in or about January 1989, initially as chief of
the division of molecular medicine in the Department of Medicine.
((Scherr Aff. ¶¶ 7-8; Silver Aff. ¶ 2; Silver Dep. 21:11-15).  In
August 2000, at the time of its creation as an entity separate
from the Hospital (but still part of the Health System), the
Institute (at the time the North Shore-Long Island Jewish
Research Institute, later the Feinstein Institute for Medical
Research) offered and Silver accepted a position as a Senior
Investigator in the Scientific track.  (Silver Dep. 20:8-21:5;
Chiorazzi Dep. 8:8-9:4).

On February 28, 2005 Silver was informed by Chiorazzi
and Robin Wittenstein, Chief Operating Office of the Institute,
that he would be discharged from the Institute effective March 2,
2005.  (Chiorazzi Aff. ¶¶ 20-21; Wittenstein Aff. ¶ 7).  Silver
was fifty-nine years old at the time.  (Silver Dep. 98:25-99:13).

**2.   <u>Structure of the Institute</u>**

The Institute has three ranks of investigator:  The
lowest rank is Assistant Investigator, followed by Associate
Investigator, and finally Senior Investigator (sometimes called
simply "Investigator").  (Chiorazzi Aff. ¶ 13; Chiorazzi Dep.
30:6-16).  In addition to the three ranks, the Institute has
three tracks for investigators:  Scientific, Technical, and
Clinical.  (Chiorazzi Aff. ¶ 13; Chiorazzi Dep. 22:17-23:7).
Investigators on the Technical track provide services to the
investigators on the Scientific track, and financial

responsibility for a Technical track investigator is with the
Scientific track investigator he or she assists.  (Chiorazzi Aff.
¶ 13; Chiorazzi Dep. 22:17-23:2).  Investigators on the Clinical
track are clinicians involved in clinical or laboratory research,
and financial responsibility for these employees rests
exclusively with that physician and his or her clinical
department.  (Chiorazzi Aff. ¶ 13; Chiorazzi Dep. 33:25-34:7).

Only investigators on the Scientific track must obtain
their own sources of funding.  (Silver Dep. 23:8-15; Chiorazzi
Aff. ¶ 13; Chiorazzi Dep. 32:25-33:18).  Other duties of
Scientific track investigators include conducting research,
providing guidance to junior associates and helping them to
obtain funding, and being scientifically productive.  (Silver
Dep. 25:22-26:4).  Senior and Associate Investigators in the
Scientific track may head their own laboratories ("Lab Heads").
(Chiorazzi Aff. ¶ 13).

### 3.   Silver's Funding

When Silver interviewed with Sherr for the position at
the Hospital, Sherr informed him that he would have to generate
his own funding through grants at all times.  (Silver Dep. 14:19-
23, 15:15-19).  Sherr stated that if Silver ever lost all his
funding the Hospital System would grant him two years to look for
another position.  (Id. at 15:15-16:13).

For many years Silver received funding from the
National Institutes of Health (the "NIH"), but last received
funding from the NIH in 1999.  (Id. at 91:3-11; Def.'s Notice of

Mot. Ex. K).  In 2003, Silver reapplied for a previously submitted $200,000 NIH grant, but did not obtain any funding from the NIH that year.  (Silver Dep. 34:22-35:10, 124:13-16).  In 2004, Silver again reapplied for that same grant, resubmitting a grant application that had been denied two times previously. (Id. at 89:6-18, 123:22-25, 124:13-16).  After his discharge Silver learned that this grant was not funded by the NIH. (Id. at 89:19-24).

        In 2004 Silver applied for a $36,000 grant from the American College of Gastroenterology.  (Id. at 90:2-4).  After his dismissal, Silver learned that this grant had not been funded.  (Id. at 90:5-9).

        Starting in 2000 or 2001 until 2004, Silver applied for and received annual grants from the Litwin Foundation.  (Id. at 41:3-23, 42:5-11).  The Litwin Grant was for $150,000, to be matched by $100,000 from the Hospital.  (Id. at 41:12-17).  The Litwin Foundation stopped funding Silver in 2004, following a "progress report" meeting wherein Silver stated that he was not collaborating and would not collaborate with other researchers, and that he was a "loner."  (Id. at 43:25-55:16; Def.'s Notice of Mot. Ex. N ("Letter from the Litwin Foundation")).

        In 2002, Silver's lab had a $47,692.28 deficit. (Silver Dep. 94:13-95:2).  In 2003, his lab had a $119,188.36 deficit.  (Id. at 95:4-10).  In 2004, Silver's lab appears to have had a deficit of $158,124.82.  (Id. at 95:20-96:25).

**4.** **Silver's Employment Evaluations**

In March 2003, Silver received his employment evaluation for the preceding twelve months. (Id. at 28:12-29:11). Silver was rated a two out of five for his efforts to "[w]rite[] proposals to various organizations for funding of research." (Def.'s Notice of Mot. Ex. L ("2003 Silver Evaluation")). At his deposition, Silver stated that this rating "meant . . . that Dr. Chiorazzi wasn't aware of all the grant applications [he] had submitted." (Silver Dep. 30:15-24). Although Silver felt the rating was "inaccurate," he did not inform Chiorazzi that he had submitted additional applications that Chiorazzi was unaware of, because Silver "didn't feel it would serve any purpose," and because he "agreed [that he] needed more funding." (Id. at 31:12-25). The 2003 evaluation also stated that Silver's productivity in terms of publications was moderate and needed improvement, an assessment with which Silver agreed. (2003 Silver Evaluation; Silver Dep. 40:17-20).

In November 2004, Silver received another employment evaluation. (Silver Dep. 65:22-25; Def.'s Notice of Mot. Ex. P ("2004 Silver Evaluation")). Regarding Silver's level of funding, Chiorazzi wrote as follows: "Needs to continue to pursue peer review research support from the NIH and other foundations and agencies. Cannot rely solely on contribution funds to support research program." (2004 Silver Evaluation). Silver agreed "a hundred percent" with Chiorazzi's comments regarding his need for funding. (Silver Dep. 71:22-72:3). On or

about November 23, 2004, Silver tape-recorded a conversation between himself and Chiorazzi about the evaluation (the "Recorded Conversation").  (Id. at 67:9-25; see Def.'s Notice of Mot. Ex. S ("Transcript")).

 5.  **Other Employees at the Institute**

  a.  **Employees Cited by Silver**

Silver recounts examples of other, younger employees of the institute being treated differently than he was.

First, he cites Dr. David Callaway.  Callaway was another Institute employee who at one time had been a Lab Head. (Id. at 97:10-98:5).  Although during the Recorded Conversation Chiorazzi told Silver that he would discharge both Silver and Callaway at the same time -- near the beginning of 2005 -- for lack of funding, Callaway was permitted to stay on as a Institute employee for two months longer than Silver.  (Silver Dep. 97:5-98:9; Chiorazzi Aff. ¶ 28; Chiorazzi Dep. 164:22-166:13; Transcript).  Callaway was forty-eight at the time of his discharge on May 16, 2005.  (Chiorazzi Aff. ¶ 28; Chiorazzi Dep. 164:15-18).

Second, Silver cites examples of other Institute employees who had no external sources of funding for "years and years" but were not discharged.  (Silver Dep. 102:9-13, 115:6-18).  Silver names two Scientific track Associate Investigators and one Scientific track Assistant Investigator, and two Technical track Associate Investigators and one Technical track Assistant Investigator, all between the ages of 41 and 52.  (Id.

at 115:10-18, 150:4-151:2, 152:21-153:17, 154:17-155:7; Braverman Aff. Ex. W). Silver does not name any Senior Investigators on either track. At the time Silver filed his complaint in this case, none of these employees had been discharged from the Institute. (Braverman Aff. Exs. W, X).

Third, Silver submitted employee evaluations of two Scientific track Associate Investigators and two Scientific track Assistant Investigators, and one Technical track Assistant Investigator, all between the ages of 41 and 52. (Braverman Aff. Ex. F). These evaluations show that for many years these employees were graded satisfactory or below on their efforts to obtain funding, and some evaluations contain comments admonishing them to obtain more funding. (Id.). At the time Silver filed his complaint in this case, none of these employees had been dismissed from the Institute. (Id. Exs. W, X).

Fourth, Silver notes that Chu, who had trouble obtaining funding and was forty-five at the time of Silver's dismissal, was shifted to the Technical track so that he was no longer responsible for bringing in his own funds. (Silver Dep. 116:11-21). Chiorazzi testified at his deposition that in 2000 or 2001 he wanted to switch Silver to the Technical track also, because the Institute was being audited and Chiorazzi understood that investigators without NIH grants, such as Silver and Chu, would reflect poorly on the Institute. (Chiorazzi Dep. 70:6-13; Silver Dep. 118:3-23). Chiorazzi testified at his deposition that he did change Silver to the Technical track in 2002. (Chiorazzi Dep. 69:2-70:22).

- 8 -

Fifth, Silver states that while he was not offered a severance package, other, younger employees were. (Silver Dep. 119:6-12). Silver names only Dr. Robert Pergolizza, head of the core facility that provided services to the investigators, as one such employee. (Id. at 119:6-25, 122:9-11). Silver believes Pergolizza to be in his late forties, but produced no documentary evidence with respect to him. (Id. at 129:9-11).

Finally, in 2003 the Institute hired a younger person, Sophia Yancopoulos, to be a medical writer, even though funds were short, she had little experience, and the Institute could have moved Silver into that position instead. (Id. at 156:11-157:17).

### b.   Employees Cited by Defendants

On September 1, 2003, Dr. Hao Peng Duffy, who was a Lab Head at the Institute, was discharged by Chiorazzi for lack of funding. (Chiorazzi Aff. ¶ 28; Halfant Dep. 46). Duffy was fifty-three years old at the time. (Chiorazzi Aff. ¶ 28).

At the time of Silver's dismissal, all thirty-five Lab Heads employed by the Institute were over age forty. (Id. ¶ 26).

### 6.   Chiorazzi's Actions and Comments

From the time of the Institute's creation, Chiorazzi was its CEO and director, with responsibility for hiring, firing, and demoting all ranks of investigators, in addition to being a Senior Investigator on the Scientific track and a Lab Head. (Chiorazzi Dep. 28:21-29:3). Chiorazzi was fifty-nine years old at the time he dismissed Silver. (Id. at 9:8-14).

During a meeting between Silver and Chiorazzi sometime in or about 2004 and prior to the Recorded Conversation, Chiorazzi said to Silver "that it [i]s difficult for older people to get funding." (Silver Dep. 104:14-105:6). Silver asked Chiorazzi if he had any evidence for that claim, and Chiorazzi replied that he had heard this at a session evaluating investigators. (Id.).

On at least one other occasion, Chiorazzi remarked to Silver that it was difficult for older scientists to obtain funding. (Id. at 107:19-108:20).

During the Recorded Conversation in November 2004, Chiorazzi informed Silver that he would be discharged in early 2005 for lack of funding, and that the Institute was unwilling to support him any longer without outside funding. (Transcript; Silver Dep. 85:22-25; Chiorazzi Aff. ¶ 19). Chiorazzi stated that if Silver could not obtain sufficient funding for his entire laboratory, he would be discharged no later than mid-February 2005. (Chiorazzi Aff. ¶ 21). This was the first time Chiorazzi informed Silver that he would be dismissed if he did not obtain funding; prior to this conversation, Silver understood that if he could not obtain funding the Institute "would find someplace else where [he] could work and contribute." (Silver Dep. 102:3-21). Silver and Chiorazzi had the following exchange:

> CHIORAZZI:   [W]e're not talking about being
> able to look to the future in this case. You know
> what I mean? It's the same as me, right? If you
> were 35 years old, okay? I'm being frank. And if
> I was 35 years old, people would say, oh, he
> has a potential gene, you know? It's worth it.

But let's face it, we're both almost 60 years old,
right?  We're the same age -- we're 57?

SILVER:          I'm gonna be 59 soon.

CHIORAZZI:       Yeah, so we're the same age . . .
four or five years . . . . It's just not the way
it is.  People are not going to lay out money for
people like us anymore . . . on the basis of
promise.

SILVER:          That's, I mean, that's the
hospital's decision?

CHIORAZZI:       I think that's the world's
decision, I'll be frank with you.  Plus there's
the issue of we don't have it to lay out, you
know?  Again, if there was a stash where I could
say to Robin, look, all right, we just need to
give it to him for six months, that would be a
different story.  We don't have it, honestly.

(Transcript 12).

Following this conversation, Chiorazzi spoke with other
Institute employees, seeking to find someone to employ Silver in
a lab.  (Silver Dep. 103:6-20).  Chiorazzi confirmed in an e-mail
message to Silver that he had spoken with other investigators
about bringing Silver into their labs, but Silver testified at
his deposition that Chiorazzi "didn't say he would support me in
that respect."  (Id. at 103:14-20).

At his deposition, Chiorazzi testified that age "was
linked to [his] decision-making process" in deciding to dismiss
Silver, in that "[i]t was linked in relationship to [Silver's]
ability to publish important papers in the field, his ability to
generate financial support for his research, and his ability to
adapt to what was necessary to survive in the scientific
community."  (Chiorazzi Dep. 36:21-37:10).

- 11 -

### 7.   __Silver's EEOC Charge__

On February 10, 2005, Silver filed an age discrimination charge with the EEOC.  (Def.'s Notice of Mot. Ex. T).  Defendants became aware of the charge the following day. (Def.'s Mem. of Law 26).  On May 10, 2005, the EEOC dismissed Silver's charge.  (Def.'s Notice of Mot. Ex. U).  Three weeks later, Silver was discharged.  (Chiorazzi Aff. ¶¶ 20-21; Wittenstein Aff. ¶ 7).

## B.   __Procedural History__

Silver filed his original complaint in this action on August 1, 2005, and an amended complaint on July 14, 2006. Silver alleges that the Health System, the Hospital, and the Institute discriminated against him because of his age in violation of the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. § 623(a)(1), and New York state law, by dismissing him for lack of funding while providing funding to other, younger employees, and not discharging them despite their funding shortfalls.  He also alleges that the Institute retaliated against him by dismissing him after learning that he had filed an age discrimination charge with the EEOC.

Defendants filed this motion for summary judgment on December 1, 2006.  For the reasons set forth below, the motion is denied.

**DISCUSSION**

**A.    Summary Judgment Standard**

         The standards governing motions for summary judgment
are well-settled.  A court may grant summary judgment only where
there is no genuine issue of material fact and the moving party
is therefore entitled to judgment as a matter of law.  See Fed R.
Civ. P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574, 585-87 (1986).  Accordingly, the court's task is
not to "weigh the evidence and determine the truth of the matter
but to determine whether there is a genuine issue for trial."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  To
create an issue for trial, there must be sufficient evidence in
the record to support a jury verdict in the nonmoving party's
favor.  See id.

         To defeat a motion for summary judgment, the nonmoving
party "must do more than simply show that there is some
metaphysical doubt as to the material facts."  Matsushita, 475
U.S. at 586.  As the U.S. Supreme Court stated in Anderson, "[i]f
the evidence is merely colorable, or is not significantly
probative, summary judgment may be granted."  Anderson, 477 U.S.
at 249-50 (citations omitted).  The nonmoving party may not rest
upon mere conclusory allegations or denials, but must set forth
"concrete particulars" showing that a trial is needed.  Nat'l
Union Fire Ins. Co. v. Deloach, 708 F. Supp. 1371, 1379 (S.D.N.Y.
1989) (quoting R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d
69, 77 (2d Cir. 1984) (internal quotations omitted)).

                              - 13 -

Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." BellSouth Telecomms., Inc. v. W.R. Grace & Co., 77 F.3d 603, 615 (2d Cir. 1996) (quotations omitted).

**B.    Employment Discrimination**

**1.    Applicable Law**

The "ultimate issue" in any employment discrimination case is whether the plaintiff has met his burden of proving that the adverse employment decision was motivated at least in part by an "impermissible reason," i.e., that there was discriminatory intent. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146 (2000); Fields v. N.Y. State Office of Mental Retardation & Dev. Disabilities, 115 F.3d 116, 119 (2d Cir. 1997). In the absence of direct evidence of discrimination, courts apply the burden-shifting framework for federal discrimination claims set out by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). In a case such as this one, however, where plaintiff presents direct evidence of discrimination, plaintiffs often rely on a "mixed-motive" analysis. See, e.g., Stratton v. Dep't for the Aging for the City of N.Y., 132 F.3d 869, 878 (2d Cir. 1997); Lapsley v. Columbia Univ.-Coll. of Physicians & Surgeons, 999 F.Supp. 506, 514 (S.D.N.Y. 1998).

### a.  **Price Waterhouse Analysis**

In mixed motive cases, that is, cases where both legitimate and illegitimate reasons motivated the challenged employment decision, courts use the analysis set forth in Price Waterhouse v. Hopkins.  490 U.S. 228 (1989), superseded by statute on other grounds, Civil Rights Act of 1991, Pub. L. No. 102-166; 105 Stat. 1074; see Woodman v. WWOR-TV, Inc., 293 F. Supp. 2d 381, 389 (S.D.N.Y. 2003), aff'd 411 F.3d 69 (2d Cir. 2005).  Pursuant to Price Waterhouse, if plaintiff establishes that the employment decision was motivated by a prohibited discriminatory reason, the burden then shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision anyway.  Price Waterhouse, 490 U.S. at 258; Rose v. N.Y. City Bd. of Educ., 257 F.3d 156, 161 (2d Cir. 2001) (Price Waterhouse applied to ADEA claims); see also Ostrowski v. Atl. Mut. Ins. Cos., 968 F.2d 171, 180 (2d Cir. 1992). "To warrant a mixed motive burden shift, the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support his allegations of discriminatory treatment." Raskin v. Wyatt Co., 125 F.3d 55, 61 (2d Cir. 1997) (citations omitted).

### b.  **Verbal Comments and Stray Remarks**

Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff.  See Schreiber v. Worldco, LLC, 324 F. Supp. 2d 512, 518-19 (S.D.N.Y. 2004); Zhang v. Barr

Labs., Inc., No. 98 Civ. 5717 (DC), 2000 WL 565185, at *4
(S.D.N.Y. May 8, 2000) (citing cases).  Often, however, an
employer will argue that a purportedly discriminatory comment is
a mere "stray remark" that does not constitute evidence of
discrimination.  See, e.g., Danzer v. Norden Sys., Inc., 151 F.3d
50, 56 (2d Cir. 1998) ("Stray remarks, even if made by a decision
maker, do not constitute sufficient evidence [to support] a case
of employment discrimination."); Campbell v. Alliance Nat'l Inc.,
107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000) ("'Stray remarks by non-
decision-makers or by decision-makers unrelated to the decision
process are rarely given great weight, particularly if they were
made temporally remote from the date of the decision.'") (quoting
Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d
Cir. 1992)).

        In determining whether a comment is a probative
statement that evidences an intent to discriminate or whether it
is a non-probative "stray remark," a court should consider the
following factors:  (1) who made the remark, i.e., a
decisionmaker, a supervisor, or a low-level co-worker; (2) when
the remark was made in relation to the employment decision at
issue; (3) the content of the remark, i.e., whether a reasonable
juror could view the remark as discriminatory; and (4) the
context in which the remark was made, i.e., whether it was
related to the decisionmaking process.  See Minton v. Lenox Hill
Hosp., 160 F. Supp. 2d 687, 694 (S.D.N.Y. 2001); Rizzo v. Amerada
Hess Corp., No. 99 Civ. 0168 (DNH), 2000 WL 1887533, at *5

- 16 -

(N.D.N.Y. Dec. 29, 2000) ("An employer's discriminatory statements will rise above the level of stray remarks . . . when the statements are:  (1) made by the decision maker or one whose recommendation is sought by the decision maker; (2) related to the specific employment decision challenged; and (3) made close in time to the decision."); Ruane v. Coont'l Cas. Co., No. 96 Civ. 7153 (LBS), 1998 WL 292103, at *8 (S.D.N.Y. June 3, 1998); see also Mosberger v. CPG Nutrients, Civ. No. 01-100 (DWA), 2002 WL 31477292, at *7 (W.D. Pa. Sept. 6, 2002) ("Discriminatory stray remarks are generally considered in one of three categories -- those made (1) by a non-decisionmaker; (2) by a decisionmaker but unrelated to the decision process; or (3) by a decisionmaker but temporally remote from the adverse employment decision.") (internal quotations and citations omitted).

Additionally, the Second Circuit has emphasized that "[a]lthough evidence of one stray comment by itself is usually not sufficient proof to show age discrimination, that stray comment may 'bear a more ominous significance' when considered within the totality of the evidence." Carlton v. Music Transp., Inc., 202 F.3d 129, 136 (2d Cir. 2000) (quoting Danzer, 151 F.3d at 56); see also Schreiber, 324 F. Supp. 2d at 522-23.  "Even 'stray remarks in the workplace by persons who are not involved in the pertinent decision making process . . . may suffice to present a prima facie case,' provided those remarks evidence invidious discrimination." Belgrave v. City of New York, No. 95 Civ. 1507 (JG), 1999 WL 692034, at *29 (E.D.N.Y. Aug. 31, 1999)

(quoting <u>Ostrowski</u>, 968 F.2d at 182), <u>aff'd</u> 216 F.3d 1071 (2d Cir. 2000); <u>see also</u> <u>Malarkey v. Texaco, Inc.</u>, 983 F.2d 1204, 1210 (2d Cir. 1993) (holding that statements made by non-decisionmakers were properly received "because they showed the pervasive corporate hostility towards [plaintiff] and supported her claim that she did not receive a promotion due to her employer's retaliatory animus"); <u>Warren v. Halstead Indus., Inc.</u>, 802 F.2d 746, 753 (4th Cir. 1986) (holding that evidence of a "general atmosphere of discrimination," harassment, or threats is "relevant to the determinations of intent and pretext").

## 2.  **Application**

Claims of employment discrimination brought under the ADEA are subject to the same burden-shifting analysis as claims brought under Title VII, as set forth in <u>Price Waterhouse</u>. <u>Rose</u>, 257 F.3d at 161.  The <u>Price Waterhouse</u> framework also applies, in general, to state discrimination claims.  <u>Ames v. Cartier, Inc.</u>, 193 F. Supp. 2d 762, 767 (S.D.N.Y. 2002); <u>see</u> <u>Norville v. Staten Island Univ. Hosp.</u>, 196 F.3d 89, 95 (2d Cir. 1999).  Accordingly, I discuss the ADEA and state discrimination claims together.

### a.  **Plaintiff's Evidence**

Plaintiff offers the following evidence in support of his age discrimination claim:

First, plaintiff was fifty-nine years old and had been an employee of the Health System for sixteen years, and the Institute for five years, at the time he was dismissed.  The ADEA protects employees over age forty.  <u>See</u> 29 U.S.C. § 631(a).

- 18 -

Second, Chiorazzi admitted at his deposition that plaintiff's age was a factor in his decision to dismiss plaintiff. (See Chiorazzi Dep. 36-37).

Third, in the Recorded Conversation discussing plaintiff's funding problems and impending dismissal, Chiorazzi, the individual who had ultimate decision making authority to hire and fire Institute employees, stated that, in reference to plaintiff's age, "[p]eople are not going to lay out money for people like us any more . . . on the basis of promise," and stated that were plaintiff thirty-five years old -- significantly, not within the ADEA protected class -- somehow the situation would be different. (See Transcript 12).

Fourth, plaintiff offers examples of other, younger employees who were treated differently than he was.  Silver cites younger employees who retained employment despite lack of funding. (See Silver Dep. 97-98, 102, 115, 150, 152-55).  He contends that Chu was transferred to the Technical track so that he would not have to obtain his own funding. (See Braverman Ex. W).  Next Silver alleges that a younger employee received a severance package, although he presents nothing more than this allegation. (See Silver Dep. 119, 122).  Finally, he claims that another, younger employee received a position he was qualified for, although he provides nothing more than the allegation. (See id. at 156-57).

In the end, the most probative, admissible evidence of age discrimination offered by Silver is that he was fifty-nine

years old when he was discharged, Chiorazzi admitted that age was linked to his decision-making process in dismissing Silver, and Chiorazzi made remarks about age to Silver while discussing his intention to dismiss Silver.

### b.   Defendants' Evidence

Defendants offer the following evidence in support of their motion for summary judgment:

Silver had lacked an NIH grant since before 2000.  (See Silver Dep. 91; Def.'s Notice of Mot. Ex. K).  While Silver had some external sources of funding between 2000 and his dismissal in 2005, the level of funding declined each year.  (See Braverman Aff. Ex. V).  His greatest source of outside funding was not renewed because he refused to work with other scientists, despite a specific request that he do so by the group that had been funding him.  (See Letter from the Litwin Foundation).  The Institute claims that it could not pay Silver's salary due to budget constraints, and therefore discharged him when his grant money was exhausted.

Additionally, Silver and Chiorazzi were approximately the same age, every investigator Silver cites as receiving preferential treatment falls within the ADEA protected class, and several investigators still employed at the Institute are his same age or older.  (See Braverman Aff. Ex. X).

Finally, defendants argue that Chiorazzi's remark to Silver about age in the Recorded Conversation was a stray remark,

and was merely a reporting of the preferences of outside funding sources.  (See Def.'s Mem. of Law 18-21).

      **c.**   **The Record As a Whole**

     Examining the record as a whole, and resolving all conflicts in evidence and drawing all reasonable inferences in plaintiff's favor, I conclude that a reasonable jury could find that plaintiff's age was a factor in his dismissal.

     Silver has produced direct evidence of discrimination. Chiorazzi admitted in deposition testimony that Silver's age was a factor in his dismissal.  The ADEA prohibits employers from discharging an employee because of his age.  See 29 U.S.C. § 623.

     Chiorazzi also made remarks about Silver's age, or age generally, related to employment on at least three occasions. The remark during the Recorded Conversation was (1) made by the decision maker, Chiorazzi; (2) related to the specific employment decision, Silver's dismissal; and (3) made close in time to the decision, in that Chiorazzi informed Silver in the same meeting that he would be dismissed.  Rizzo, 2000 WL 1887533, at *5; see Minton, 160 F. Supp. 2d at 694.  Despite defendants' arguments to the contrary, I cannot conclude as a matter of law that these were mere "stray remarks."

     Accordingly, I find that Silver has produced, at the least, a "thick cloud of smoke" supporting his claim of discriminatory treatment.  See Raskin, 125 F.3d at 61.

     Because I find that Silver has produced direct evidence of discrimination, the burden shifts to defendants to show that

they would have made the same employment decision even absent the impermissible factor, i.e., Silver's age. See Price Waterhouse, 490 U.S. at 258; Rose, 257 F.3d at 161.

Defendants' stated grounds for dismissing Silver is that he lacked funding from outside sources. (Chiorazzi Aff. ¶ 24). In the Recorded Conversation, Chiorazzi noted that both he and Silver were in their late fifties, and then stated that "[p]eople are not going to lay out money for people like us anymore . . . on the basis of promise." (Transcript 12). Although this remark refers to outside sources of funding, it also "'directly reflect[s] the alleged discriminatory attitude.'" Ames, 193 F. Supp. 2d at 768 (quoting Lightfoot v. Union Carbide Corp., 110 F.3d 898, 913 (2d Cir. 1997)) (further quotations omitted). Defendants' attempt to shift the locus of discrimination from themselves to other "people," meaning outside sources of funding, is unpersuasive. Cf. Wigginess Inc. v. Fruchtman, 482 F. Supp. 681, 692 (S.D.N.Y. 1979) ("Employers may not discriminate on the basis of their customers' preferences." (citing Diaz v. Pan American World Airways, Inc., 442 F.2d 385, 389 (5th Cir. 1971))), aff'd, 628 F.2d 1326 (2d Cir. 1980)). Accordingly, I conclude that defendants have not shown that a reasonable jury could only find that defendants would have made the same decision regardless of Silver's age.

Finally, I observe that while the probative value of Silver's account of the treatment of other employees is unclear, there do appear to be issues of fact as to whether at least some

of these employees are "comparables," and hence genuine issues of material fact exist for trial.  (See Braverman Aff. Ex. X).

Examining the record as a whole, I hold that a reasonable jury could conclude that more likely than not Silver was discriminated against at least in part because of his age. Consequently summary judgment is denied with respect to Silver's ADEA and New York state employment discrimination claims.

## C.  **Retaliation**

### 1.  **Applicable Law**

Title VII prohibits an employer from firing an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a); see also N.Y. Exec. Law § 296(1)(e).  Thus, Title VII's "participation clause" protects participation in a proceeding under Title VII. See Deravin v. Kerik, 335 F.3d 195, 203 n.6 (2d Cir. 2003). Further, "Title VII is violated when 'a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause.'"  Terry v. Ashcroft, 336 F.3d 128, 140-41 (2d Cir. 2003) (internal citations omitted).  "The same standards and burdens apply to claims of retaliation in violation of the ADEA."  Id. at 141 (stating that ADEA retaliation claims are analyzed under the same framework as claims brought pursuant to Title VII)).

To establish a prima facie case of retaliatory discharge, Silver must show that (1) he was engaged in protected

activity; (2) defendants were aware of that activity; (3) he was discharged; and (4) there was a causal connection between the protected activity and the termination or suspension. Id. at 140-41; see Nakis v. Potter, 422 F. Supp. 2d 398, 418 (S.D.N.Y. 2006). A plaintiff may present proof of causation either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or . . . (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Gordon v. N.Y. City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000) (Title VII); see Nakis, 422 F. Supp. 2d at 422-23 (ADEA); see also Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993) (Title VII).

Although the burden that a plaintiff must meet at the prima facie stage is de minimis, the plaintiff must at least proffer competent evidence of circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. See Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 204 (2d Cir. 1995).

   2.   **Application**

Retaliation claims are governed by the burden-shifting framework set out by the Supreme Court in McDonnell Douglas. Terry, 336 F.3d at 141. I assume that plaintiff has made out the prima facie case required by McDonnell Douglas. Defendants have articulated a legitimate, nondiscriminatory reason for plaintiff's dismissal: Silver's lack of funds. Thus, I proceed directly to the ultimate question of whether plaintiff has

presented sufficient evidence from which a reasonable jury could find retaliation.

Defendants do not dispute that plaintiff filed an EEOC charge, they were aware of the charge prior to his official discharge, and he was in fact discharged.  Silver's main evidence of causation consists of the temporal proximity of his filing the EEOC charge to his dismissal.  Defendants concede that they learned that Silver filed the charge on February 11, 2005 (Def.'s Mem. of Law 26), and he was subsequently notified in late February that his last day at the Institute would be March 2nd. (See Chiorazzi Aff. ¶ 23).  Close temporal proximity can be enough to show causation, and the Second Circuit has held sufficient a "mere twelve day" period between complaint and discharge.  Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996).

In light of all the evidence, I reject defendants' argument that there cannot be a retaliation claim because the Institute had decided to fire Silver before he filed the EEOC charge.  (See Def.'s Mem. of Law 18-21).  During the Recorded Conversation, Chiorazzi did not specify exactly when Silver would be discharged.  (Transcript 7 ("Silver:  You're gonna fire me come what, come January, February, March?  Chiorazzi:  Yeah, probably February.  Maybe we can try and keep it going until we get -- I don't know.  It could be January.  I don't know.")). Furthermore, Callaway, whom Chiorazzi stated would also be discharged in February (Transcript 6 ("I just told David

Call[a]way that he has to leave in February because we have no money for him.")), was employed at the Institute until mid-May. (Chiorazzi Dep. 164).

I conclude that a reasonable jury could find that Silver was retaliated against for filing the EEOC charge. Accordingly, summary judgment with respect to the retaliation claim is denied.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is denied. The parties shall appear for a pretrial conference on June 5, 2007 at 10 a.m.

SO ORDERED.

Dated:     New York, New York
           May 21, 2007

                                    DENNY CHIN
                                    United States District Judge